UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STEPHANIE M. DUPUIS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ZILLOW GROUP, INC., et al.,<br><br>Defendants. | CASE NO. C26-5049JLR<br><br>ORDER |

## I. INTRODUCTION

Before the court is the Zillow Defendants'[1] motion to dismiss Plaintiffs'[2] amended class action complaint ("ACAC") for failure to state a claim. (MTD (Dkt. # 30); Reply (Dkt. # 33); *see also* ACAC (Dkt. # 27).) Plaintiffs oppose the motion. (Resp. (Dkt.

[1] The Zillow Defendants are Zillow Group, Inc. ("Zillow Group"), Zillow Inc., Zillow Home Loans, LLC, Zillow Homes, Inc., Zillow Listing Services, Inc. (collectively "Zillow"). (*See* ACAC at 1.)

[2] The named Plaintiffs are Stephanie M. Dupuis, Sound Music I, Inc. ("Sound Music"), Brian Graham, and Anna Alvarez (together, "Plaintiffs").

# 32-1).) The court has considered the parties' submissions, the relevant portions of the record, and the governing law. Being fully advised,[3] the court DENIES the motion to dismiss.

## II. BACKGROUND

Plaintiffs bring this putative class action alleging that Defendants leverage their digital real estate dominance to restrain competition, tie separate products, and coerce real estate professionals. (ACAC ¶¶ 12, 94-177.) Specifically, Plaintiffs assert five causes of action for (1) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, against all Defendants for tying and unreasonable agreement in restraint of trade, and Section 2 of the Sherman Act, 15 U.S.C. § 2, for abuse of monopoly power; (2) violation of the Washington Consumer Protection Act ("WCPA"), RCW 19.86.010 *et seq*., against all Washington-domiciled Defendants for anticompetitive, unfair, or deceptive business practices; (3) unjust enrichment against all Washington-domiciled Defendants under Washington law, and against all Defendants under the laws of Maryland and Oregon; (4) violation of the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-201 *et seq*., against all Defendants; and (5) the Oregon Unfair Trade Practices Act ("UTPA"), Or. Rev. Stat. § 646.605 *et seq.,* against all Defendants. (*See id*.)

Plaintiffs allege that Zillow operates the "most widely used online real estate search portal in the United States." (*Id*. ¶ 25.) According to the ACAC, Zillow has

---

[3] The Zillow Defendants request oral argument and Plaintiffs do not. (*See* MTD at 1; Resp.) The court concludes that oral argument would not aid in its disposition of the motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

maintained a dominant market share in the digital real estate search market, capturing 61% of all daily active users of online listing applications. (*Id.*) Plaintiffs assert that, as a result of Zillow's dominance, it is exceedingly difficult for modern agents and brokerage teams to participate in the market for real estate search without participating in the Zillow ecosystem. (*Id.* ¶ 8.) Zillow itself estimates that 80% of all domestic real estate transactions in the United States involve an agent who uses at least one product within its network. (*Id.* ¶ 2 (citing Zillow Group, Inc., *Annual Report (Form 10-K)*, at 4 (Feb. 11, 2026) [hereinafter 2026 Annual Report]).) The Zillow ecosystem includes platforms such as Premier Agent, Zillow Preferred, Follow Up Boss ("FUB"), and Zillow Workspace (comprising ShowingTime, Zillow Showcase, and dotloop). (*Id.*)

**A. Referral Programs**

Capitalizing on its strong position among real estate search portals, Zillow generates and sells potential homebuyer referrals (called "connections") to licensed real estate agents through its "Premier Agent" and "Preferred Agent" programs. (*Id.* ¶¶ 2, 9.) Connections are generated when a consumer uses the Zillow application to request a property tour. (*Id.* ¶ 9.) Under the Premier Agent program, real estate professionals pay upfront fees for client connections. (*Id.*) Under the Preferred Agent program (also known as "Flex"), agents do not pay upfront for referrals but must instead remit up to 40% of their backend compensation to Zillow upon closing a referred sale. (*Id.* ¶¶ 9, 30.) Plaintiffs allege that despite these high costs, Zillow's monopoly power in the real estate search market makes these connections an essential source of business for modern real estate agents and brokerages. (*Id* ¶ 9.)

**B. Alleged Anti-Competitive and Coercive Schemes**

Plaintiffs allege that Zillow engages in two independent anticompetitive practices: (1) a Customer Relation Management ("CRM") tying arrangement and (2) a coercive steering scheme involving Zillow Home Loans ("ZHL"). (*Id.* ¶¶ 4-5.)

1. <u>The CRM Tying Arrangement</u>

Plaintiffs contend that Zillow leverages agents' economic dependence on referrals to compel them into an unlawful tying arrangement. (*Id.* ¶¶ 2-4.) Specifically, Zillow allegedly requires Premier or Preferred agents to purchase and use its proprietary FUB CRM software to manage referred leads. (*Id.* ¶ 4.) Zillow enforces this requirement despite the presence of competing CRM platforms and its prior practice of providing referrals through a complimentary CRM tool. (*Id.*) According to Plaintiffs, Zillow has used its market power to foreclose competitors from an excessively large portion of the market for CRM software, citing Zillow's own admission that FUB now "powers daily activity for more than 80% of the highest-volume teams in the country." (*Id.* (citation omitted).) Plaintiffs further allege this mandate serves a dual anticompetitive function: monetizing software subscriptions and providing Zillow with integrated data tracking to monitor agent performance and enforce steering mandates. (*Id.*)

2. <u>Coercive Steering and the ZHL Scheme</u>

Plaintiffs also allege that Zillow extracts additional profits by using its lead-generation monopoly to coerce real estate agents into steering homebuyers toward ZHL, its mortgage lending service. (*Id.* ¶¶ 5, 10.) Zillow uses FUB to track the performance of Preferred Agents, tying their internal ratings directly to the volume of

loan pre-approvals they secure through ZHL. (*Id.* ¶ 10.) Under this system, higher-rated agents receive a higher quantity and quality of lucrative client connections. (*Id.*) Conversely, agents who fail to direct enough clients to ZHL receive a demotion in their internal ratings, are assigned fewer or lower-value connections, face substantial financial losses, and risk program termination. (*Id.* ¶¶ 5, 10-11.) Zillow allegedly enforces these penalties strictly, regardless of the agent's tenure or past success across other performance metrics. (*Id.* ¶ 5.)

Plaintiffs object to this arrangement, asserting that steering homebuyers to ZHL could conflict with their obligations as real estate professionals to act in their clients' best interests. (*Id.* ¶ 11.) They also allege that the pressure to promote ZHL risks steering consumers into inferior loan products. (*Id.*) Indeed, Plaintiffs note that Zillow's own public disclosures acknowledge a corporate risk that ZHL "may not meet customers' financing needs with its product offerings." (*Id.* (quoting 2026 Annual Report).) Furthermore, Plaintiffs contend that mandatory steering to ZHL could expose agents to legal liability under the Real Estate Settlement Practices Act ("RESPA"). (*Id.*) Plaintiffs assert that this coercive steering constitutes an unreasonable agreement and an unfair business practice that harms both homebuying consumers and real estate professionals in violation of federal and state antitrust laws and state consumer protection statutes. (*Id.* ¶¶ 5, 11-12.)

**C. Procedural History**

Plaintiffs Stephanie M. Dupuis and Sound Music initiated this antitrust and consumer protection action on January 16, 2026. (*See generally* Compl. (Dkt. # 1).) On

May 4, 2026, Plaintiffs filed the ACAC, adding Brian Graham and Anna Alvarez as named plaintiffs. (*See generally* ACAC.) On June 1, 2026, Zillow moved to dismiss the action for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See generally* MTD.) The motion is now fully briefed and ripe for the court's consideration. (*See generally* Resp.; Reply.)

## III. ANALYSIS

The court first sets forth the applicable legal standard before reviewing the parties' arguments.

### A. Governing Legal Standard

Rule 12(b)(6) provides for dismissal when a complaint "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). Under this standard, the court construes the allegations in the light most favorable to the nonmoving party, *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005), and asks whether the claim contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[,]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court need not accept as true legal conclusions, "'formulaic recitation[s] of the elements of a cause of action[,]'" *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555), or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences[,]" *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**B. Plaintiffs State Plausible Markets.**

To survive a motion to dismiss, an antitrust plaintiff must sufficiently allege both the existence of a "relevant market" and that the defendant possesses power within that market. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). Defining a relevant market requires a plaintiff to plead both a distinct product market and a corresponding geographic market. *Id.* at 1045 n.4. This requires sufficient market control that anticompetitive conduct actually injures a competitor or consumer. *Id*. at 1044. Because a properly defined market is a threshold requirement, the "[f]ailure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001) (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999)). Although market definition is typically a fact-intensive inquiry, dismissal under Rule 12(b)(6) is nonetheless appropriate if the plaintiff's proposed market definition is "facially unsustainable." *Newcal*, 513 F.3d at 1045 (citation omitted).

Defendants assert that the antitrust claims fail as a matter of law because Plaintiffs do not plead relevant product markets or geographic markets as required by the Ninth Circuit. (MTD at 6-8.) The court addresses each argument below.

1. <u>Plaintiffs Have Adequately Pleaded Product Markets.</u>

Defendants move the court to dismiss the antitrust claims, arguing that the ACAC fails to "allege what products any of these markets include, with whom Zillow competes

in each, or whether these markets are single or multi-sided." (*Id.* at 7.) Defendants further contend that Plaintiffs fail to clarify whether the product market is restricted to "online real estate[.]" (*Id.* (comparing ACAC ¶ 26 with *id.* ¶ 27).)

"The principle most fundamental to product market definition is 'cross-elasticity of demand[,]'" or "the extent to which consumers view two 'products [as] be[ing] reasonably interchangeable' or substitutable for one another." *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023) (first quoting *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979); and then quoting *Gorlick Distrib. Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013)). Accordingly, a legally sufficient product market must "encompass the product at issue as well as all economic substitutes for the product." *Newcal*, 513 F.3d at 1045. An antitrust complaint survives a Rule 12(b)(6) motion unless the alleged market suffers a "fatal legal defect" on its face. *Newcal*, 513 F.3d at 1045. The ACAC satisfies this standard by detailing four distinct product lines, how they interact, and how Zillow allegedly exercises its market leverage. (*See generally* ACAC.)

First, Plaintiffs sufficiently allege a market for real estate search. They identify plausible competitors and credibly assert that Zillow commands a dominant 61%-64% market share, substantiated by Zillow's own marketing materials. (*Id.* ¶ 25; Resp. at 4.) While Defendants point to slight language shifts in the amended complaint—such as "search marketplace" or "real estate search"—these minor language variances do not constitute a fatal legal defect at the pleading stage. *See Newcal*, 513 F.3d at 1045.

Second, the ACAC adequately alleges a distinct product market for homebuyer referrals to real estate agents via Zillow's Preferred and Premier programs. (ACAC ¶¶ 4, 9-11.) Plaintiffs anchor this market definition in practical indicia, identifying the market's unique commercial characteristics and demonstrating that referrals lack reasonable interchangeability with general advertising or lead generation services. (*Id.* ¶¶ 35, 113.) Plaintiffs also identify a discrete pool of industry competitors, corroborating this distinct referral market. (*Id.* ¶ 27 n.17 (citing Megan DeMatteo & Gina Baker, *The 8 top real estate lead generation companies for 2026*, HOUSINGWIRE (June 29, 2026) https://www.housingwire.com/articles/top-real-estate-lead-generation-companies/).)

Third, Plaintiffs sufficiently plead a product market for CRM. The ACAC explicitly identifies Zillow's FUB platform as the tied product, noting that Zillow leverages its referral engine to force Premier and Preferred agents to adopt FUB. (ACAC ¶¶ 4, 28, 46.) The ACAC defines this market by identifying essential functions of CRM software and noting that although competing CRMs exist, FUB "powers daily activity for more than 80% of the highest-volume teams in the country." (*Id.* ¶¶ 4, 46; *see also* Jeremy Wacksman, *Q4 2025 Shareholder Letter*, at 2 (Feb. 10, 2026), https://s25.q4cdn.com/975009107/files/doc_financials/2025/q4/Zillow-4Q25-Shareholders-Letter.pdf.)

Finally, the court determines that the ACAC adequately establishes a product market for residential home mortgage lending services. Plaintiffs satisfy the standard to state a product market, as set forth in *Newcal Industries, Inc.*, by identifying a distinct market for residential purchase mortgage loans, which includes both ZHL and

interchangeable third-party mortgage products offered by independent commercial lenders. 513 F.3d at 1045; (ACAC ¶¶ 28, 40.) The ACAC alleges a coercive mechanism where Zillow systematically disrupts this interchangeability by penalizing or threatening participating real estate agents who fail to steer their buyers toward ZHL. (ACAC ¶ 5.) By conditioning critical client referrals on ZHL adoption, Zillow allegedly strips agents and consumers of the ability to substitute ZHL with otherwise interchangeable independent lending products, thereby establishing a plausible tied market for the purpose of a tying claim.

Taken together, these allegations provide Zillow with fair notice of the specific products, competitive dynamics, and operational boundaries at issue. Because the proposed markets encompass the core products and outline their economic relationships, they are not facially unsustainable.

2. Plaintiffs Have Adequately Pleaded a Nationwide Geographic Market.

Zillow also moves to dismiss on the ground that Plaintiffs fail to plead a plausible geographic market. (MTD at 7-8.) A relevant geographic market is the "area of effective competition where buyers can turn for alternate sources of supply." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (alteration omitted)).

To survive a motion to dismiss, an antitrust plaintiff need only allege a geographic market definition that is plausible on its face. *Newcal*, 513 F.3d at 1045. Because market definition is inherently a factual question "dependent upon the special characteristics of

the industry involved," dismissal at the pleading stage is inappropriate unless the alleged market is entirely omitted or clearly erroneous. *Saint Alphonsus Medical Center-Nampa Inc.*, 778 F.3d at 783 (quoting *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676F.2d 1291, 1299 (9th Cir. 1982)). A nationwide geographic market is sufficiently plead where a defendant operates and coordinates its commercial policies at a corporate, national level. *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 842 (N.D. Cal. 2024) (quoting *U.S. v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)) ("A market should 'reflect commercial realities.'"); *see also Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 975-77 (9th Cir. 2023) (evaluating platform-level geographic market boundaries and anti-steering policies based on the commercial realities faced by consumers); *Newcal*, 513 F.3d at 1045 (emphasizing that geographic market boundaries turn on the "commercial realities" and must not be dismissed at the pleading stage unless "facially unsustainable").

Here, Plaintiffs have adequately alleged that the markets for real estate search, real estate referrals, CRM software, and home mortgage lending are nationwide in scope. (ACAC ¶ 97 (alleging nationwide markets for real estate search, real estate referrals, and CRM software); *id*. ¶ 5, 37 (alleging that Zillow imposes a blanket ZHL steering policy across all Zillow-affiliated agents).) Zillow argues that a national market is contradicted by Plaintiffs' allegations that real estate leads are organized and valued by zip code and region, that real estate transactions are inherently local, and that competition occurs at the regional level. (MTD at 7-8 (citing ACAC ¶¶ 29, 55, 97); Reply at 2.) This argument fails because it conflates the localized nature of individual real estate transactions with the nationwide scale of Zillow's commercial platform. Furthermore, the ACAC contains

detailed assertions that Zillow plans, mandates, and enforces its tying and steering schemes uniformly across the country. (ACAC ¶¶ 29-41, 48-52, 59-65, 70-75.) For example, Plaintiffs allege that Zillow leverages its nationwide platform to compel Preferred agents across the country to adopt FUB to retain their referral streams. (*Id.* ¶ 97.) At least one court has rejected Zillow's attempt to avoid a nationwide market definition under similar facts. *See Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201-JAV, 2026 WL 321084, at *15 (S.D.N.Y. Feb. 6, 2026) (concluding that the online real estate search market is national). Because Plaintiffs have plausibly alleged that Zillow implements its corporate policies and tying requirements on a nationwide level, they have sufficiently pleaded a nationwide geographic market. Therefore, the court denies Zillow's motion to dismiss for failure to allege a relevant market.

**C. Plaintiffs State a Plausible Tying Claim.**

Plaintiffs allege that Zillow violates Section 1 of the Sherman Act by leveraging its market power over real estate referrals to compel participating agents into an unlawful tying arrangement. (ACAC ¶¶ 95-102.) Specifically, Plaintiffs claim that Zillow's control of over 61% of all daily online real estate search traffic renders independent agents dependent on its referral stream to maintain their livelihoods. (*Id.* ¶ 95.) Zillow allegedly exploits this power by tying the purchase and use of FUB to its lucrative referral pipeline, effectively shutting out competing software providers and capturing more than 80% of the highest-volume real estate teams in the country. (*Id.* ¶¶ 96, 98, 101.) As a result of this uniform national policy, participating agents allegedly suffer

direct financial injury by paying mandatory software fees under threat of immediate referral termination. (*Id.* ¶ 100.)

1. Antitrust Standing

Zillow contends that Plaintiffs Sound Music, Graham, and Alvarez cannot maintain a tying claim because they do not explicitly allege that they personally purchased FUB, or because they retained the freedom to exit Zillow's ecosystem. (MTD at 9-10; Reply at 3-4.) It does not, however, dispute that Ms. Dupuis has antitrust standing to pursue a tying claim based on her allegation that she paid roughly $500 per month to maintain FUB after Zillow made its use mandatory. (Reply at 3; *see* ACAC ¶ 46.) Although Article III standing governs constitutional justiciability, and antitrust standing addresses whether a plaintiff is a proper evaluator of statutory injury, both doctrines are analyzed under identical multi-plaintiff rules at the pleading stage. Where multiple plaintiffs seek identical relief, the presence of one plaintiff with standing satisfies the court's jurisdictional inquiry for the entire action. *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022) ("In a suit with multiple plaintiffs, generally only one plaintiff need have standing for the suit to proceed."). Because Ms. Dupuis satisfies both constitutional and statutory antitrust standing criteria, the court need not analyze the individual standing of the remaining named Plaintiffs at this stage.

2. Modified *Per Se* Illegality

Zillow next moves to dismiss Plaintiffs' antitrust tying claim, alleging that no Plaintiff has adequately pleaded all the essential elements of such a claim. (MTD at 9-12; Reply at 3-5.) A tying arrangement is "an agreement by a party to sell one product but

only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Epic Games*, 67 F.4th at 995 (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992)). An actionable tie occurs when a seller leverages its market power over a tying product to "force the buyer into the purchase of a tied product that the buyer either did not want or would have preferred to purchase elsewhere on different terms." *Id*. (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 22 (1984), *overruled on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)). To survive a motion to dismiss, a plaintiff must plausibly allege the existence of a tie and demonstrate that the arrangement is unlawful under either a modified *per se* rule or the Rule of Reason. *Id*. at 996-97.

To qualify for modified *per se* treatment, the plaintiff must prove (1) the existence of two distinct products or services—the tying and the tied; (2) an agreement forcing the purchaser of the tying product to purchase the tied product (i.e., coercion); (3) that defendant has sufficient market power in the tying market to restrain competition in the tied market; (4) the tie affects a non-insubstantial volume of commerce in the tied market. *See id*. at 995-97 (citing *Blough v. Holland Realty, Inc*, 574 F.3d 1084, 1089 (9th Cir. 2009)).

To establish an unlawful tying arrangement, a plaintiff need not show that the defendant monopolizes the entire market or controls every individual customer. *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1339-40 (9th Cir. 1984). Instead, a modified *per se* tie can be established where a seller exercises sufficient economic leverage over an

appreciable number of dependent buyers to compel their acceptance of the tied product, effectively foreclosing their choice to seek alternative market options. *Id.* (holding that an antitrust plaintiff need not show "proof of power to fix the price of the tying product in the whole of the relevant market . . . to establish *per se* illegality"). At the Rule 12(b)(6) stage, this market power is not defined by a rigid mathematical market share percentage; rather, it represents the structural capability of a seller to force a purchaser to accept burdensome terms that could not otherwise be exacted in a competitive marketplace. *See Epic Games*, 67 F.4th at 995-97. This evaluation must be grounded in the actual commercial realities, behaviors, and structural dynamics of the specific ecosystem. *Kodak*, 504 U.S. at 466-67.

Zillow argues that *per se* treatment is unwarranted because Plaintiffs fail to plausibly allege (1) a relevant tying product market for either online real estate search or real estate customer referrals, (2) "Zillow's market share in any viable tying product market" and because (3) Plaintiffs may "simply leave Zillow to 'avoid Zillow's coercive conduct[.]'" (MTD at 10-11 (citing ACAC ¶¶ 56, 67, 79).) Specifically, Zillow contends that Plaintiffs rely on website traffic metrics, which it argues are defective proxies for measuring actual control over the market for real estate referrals. (*Id.*) The court disagrees, finding that the ACAC satisfies this pleading standard.

First, the court has already determined that Plaintiffs plausibly allege that Zillow conditions its customer referrals on the mandatory purchase and use of FUB software. *See supra* Section III. B; (*see also* ACAC ¶¶ 46, 76 (alleging that Zillow instituted a uniform, national use-it-or-lose-access policy, effectively conditioning access to its

Preferred referral pipeline on the mandatory purchase and use of FUB software).) Second, at the Rule 12(b)(6) stage, Plaintiffs need not provide a rigorous mathematical analysis demonstrating Zillow's exact share of the market for real estate customer referrals. *See Epic Games*, 67 F.4th at 995. Rather, to invoke modified *per se* treatment, it is sufficient to allege that Zillow exercises economic power over an "appreciable number" of dependent buyers to compel their acceptance of the tied product. *Digidyne*, 734 F.2d at 1340. To that end, Plaintiffs do not merely rely on consumer web traffic; they allege that Zillow leverages its dominant position in the market for real estate search into commanding leverage over the dependent market for homebuyer referrals to real estate agents. (ACAC ¶ 95.) The commercial reality of the industry, as set forth in the pleadings, is that independent agents are highly dependent on Zillow's platform to acquire viable client leads. *See Kodak*, 504 U.S. at 466-67 (noting that the evaluation of a firm's market power must be grounded in the actual commercial realities, behaviors, and structural dynamics of the specific ecosystem). The fact that Zillow could successfully force high-volume real estate teams nationwide to adopt or maintain an otherwise unwanted CRM platform under threat of immediate referral termination is, in itself, a plausible behavioral indicator of market power. (*See* ACAC ¶¶ 46, 76 (so alleging).)

Zillow's contention that Plaintiffs cannot establish coercion because agents retain the freedom to leave its ecosystem is unavailing. (MTD at 11.) The Ninth Circuit has squarely rejected the premise that a defendant may avoid tying liability simply because buyers theoretically possess outside options or could exit the platform altogether. *See*

*Digidyne*, 734 F.2d at 1340 (explaining that tying liability attaches where a seller exploits leverage over buyers dependent on its product, notwithstanding "the freedom of some or many buyers from the seller's power"); *see also Epic Games*, 67 F.4th at 995 (focusing the coercion inquiry on whether the seller imposes conditions that force buyers to purchase products they "might have preferred to purchase elsewhere on different terms" (citation omitted)).

Zillow's reliance on *Compass* for the proposition that website visits in the real estate search market does not equate to market share in the tying market for referral is similarly unpersuasive. (*See* Reply at 4-5 (discussing *Compass, Inc. v. Zillow, Inc.,* No. 25-CV-05201-JAV, 2026 WL 321084, at *15 (S.D.N.Y. Feb. 6, 2026)).) *Compass* evaluated market power within a distinct online home search market framework in the context of deciding a motion for preliminary injunction. *See* 2026 WL 321084 at *20. By contrast, the instant case focuses on Zillow tying its proprietary CRM software to its centralized referral system. Factual disputes about metrics are for summary judgment, not a motion to dismiss. Accordingly, the court determines that Plaintiffs have adequately pleaded tying market power to support a modified *per se* claim under Section 1 of the Sherman Act, and Zillow's motion to dismiss on this ground is denied. Because Plaintiffs have stated a legally cognizable *per se* claim, the court declines to address the parties' alternative arguments pertaining to the Rule of Reason at this stage of the litigation.

//

//

**D. Plaintiffs State a Plausible Section 1 Claim for Unreasonable Restraint.**

Plaintiffs allege that Zillow violates Section 1 of the Sherman Act by leveraging its market power over customer leads to impose an unlawful, coercive agreement that compels participating agents and brokerages to steer prospective homebuyers toward ZHL. (*Id.* ¶¶ 104-111.) Specifically, Zillow allegedly conditions access to its customer referral pipeline on meeting aggressive ZHL pre-approval quotas, punishing non-compliance by downgrading lead quality or terminating participants. (*Id.* ¶ 104.) According to Plaintiffs, this coercive scheme suppresses competition across both the real estate referral and mortgage lending markets by shutting out independent mortgage providers, inflating referral costs, and causing direct financial loss to non-compliant agents. (*Id.* ¶¶ 107-109.)

Zillow moves to dismiss Plaintiffs' claim for unreasonable restraint of trade, asserting that the ACAC advances two distinct theories of liability under Section 1—a "repackaged tying claim" and a vertical conspiracy between Zillow and third-party brokerages—and arguing that neither theory withstands scrutiny. (MTD at 12-14.) Importantly, under either theory, Zillow asserts that the claim fails because Plaintiffs cannot "show any anticompetitive effect, such as reduced output or quality or increased prices[.]" (*Id.* at 14.) In response, Plaintiffs clarify that Count II is not predicated on a horizontal conspiracy theory. (Resp. at 9 ("Nor is it pled as a conspiracy.").) Instead, they contend the ACAC sufficiently states a claim for an unreasonable restraint of trade under Section 1 by plausibly alleging the existence of a vertical agreement that restrains competition across both the real estate referral and mortgage lending markets, with a

substantial effect on interstate commerce. (Resp. at 9-11.) The court addresses the parties' arguments below.

Section 1 prohibits "[e]very contract, combination. . . .or conspiracy, in restraint of trade." 15 U.S.C. § 1. Because courts generally construe Section 1 to "outlaw only *unreasonable* restraints[,]" *Epic Games*, 67 F.4th at 981 (quoting *Am. Express*, 585 U.S. at 539) (emphasis in original), "a Section 1 inquiry has both a threshold component (whether there is a contract, combination, or conspiracy) and a merits component (whether it is unreasonable)[,]" *id*. (citing *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 988-89 (9th Cir. 2020)).

Plaintiffs allege, and Defendants do not dispute, that Zillow enters and maintains formal contracts with brokerages and real estate teams that are sufficient to meet Section 1's threshold component. (ACAC ¶¶ 29-30; MTD at 12-14 ; Reply at 5-6.)

Plaintiffs also sufficiently plead the existence of an unreasonable restraint. Ninth Circuit courts generally evaluate whether a practice unreasonably restrains trade in violation of Section 1 under the Rule of Reason. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012). To prevail on a motion to dismiss, an antitrust plaintiff must allege that "the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Epic Games*, 67 F.4th at 983-84 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018)). A plaintiff can show anticompetitive effects by proving that the challenged restraint leads to "'actual detrimental effects [on competition],' such as reduced output, increased prices, or decreased quality in the relevant market." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir.

2022) (citing *Am. Express*, 585 U.S. at 541). While aggressive corporate growth can be achieved through procompetitive means, a firm may not expand its market share by deploying coercive platform rules that structurally insulate its products from merit-based competition. *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 949-50 (9th Cir. 2025), *cert. dismissed sub nom. Google LLC v. Epic Games, Inc.*, 146 S. Ct. 1051 (2026).

Plaintiffs allege that Zillow uses its commanding position over the real estate referral market to anticompetitively capture home-lending opportunities for ZHL. (*See, e.g.*, ACAC ¶¶ 41, 75.) They further allege that Zillow blocks homebuyers from receiving information about superior third-party loan products by threatening to terminate agents who do not meet steering quotas. (*Id.* ¶ 75.) This distortion effectively shields ZHL from standard, merit-based market competition. A platform policy that systematically restricts consumer choice and undermines the competitive process states a plausible injury to the marketplace. *In re Google Play Store*, 147 F.4th at 932. Zillow's reliance on *United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990), is misplaced. (*See* Reply at 6.) While *Syufy* protects a company's right to grow through superior efficiency or marketing, it does not protect growth achieved through platform-enforced leverage. *Syufy Enters.*, 903 F.2d at 668-669 (holding that an "efficient, vigorous, aggressive competitor is not the villain antitrust laws are aimed at eliminating[,]" and that the law instead champions an environment where businesses compete on "efficiency and consumer goodwill").

As a result, Plaintiffs' allegations are more than sufficient to survive a motion to dismiss. *See PLS.Com*, 32 F.4th at 839. Because Plaintiffs have adequately alleged a

plausible anticompetitive effect under the Rule of Reason, the court denies Zillow's motion to dismiss on this ground.

**E. Plaintiffs Plausibly State a Claim for Abuse of Monopoly.**

Plaintiffs allege that Zillow violates Section 2 of the Sherman Act by abusing its monopoly power in the online real estate search market. (ACAC ¶¶ 113-17.) Specifically, Zillow allegedly conditions access to its valuable client referrals, the tying product, on an agent's purchase of FUB, the tied product. (ACAC ¶ 115.) Zillow then uses FUB to track and coerce agents into steering homebuyers to ZHL and allegedly blocks real estate professionals from purchasing quality referrals unless they use FUB and meet ZHL pre-approval quotas. (*Id.*) Zillow moves to dismiss Plaintiffs' Sherman Act § 2 claim for abuse of monopoly, asserting that Plaintiffs failed to plead monopoly power in the online real estate search market because they are relying on irrelevant metrics and have failed to outline structural entry barriers.[4] (*See* Reply at 6-8.)

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize" a market. 15 U.S.C. § 2. To state a plausible monopolization claim, Plaintiffs must show (1) "the possession of monopoly power in the relevant market"; (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior

[4] Zillow also argues that Plaintiffs' Section 2 claim fails because they do not plead any unlawful anticompetitive conduct. (Mot. at 16.) The court already concluded that plaintiffs adequately alleged anticompetitive conduct in the context of their Section 1 claims. *Supra* Sections III.C and D. The court adopts the same analysis here to dispose of Zillow's argument that plaintiffs fail to state a claim under Section 2. *See Epic Games*, 67 F.4th at 998.

product, business acumen, or historic accident"; and (3) "causal antitrust injury." *Epic Games*, 67 F.4th at 998 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)); *see also Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 724 (9th Cir. 2026) (holding that monopoly power requires the capability to control prices or exclude competition in a relevant antitrust market). To survive a motion to dismiss, a plaintiff must plausibly allege market dominance within the boundaries of the designated market framework. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1067-68 (9th Cir. 2025), *cert. denied,* 146 S. Ct. 1836 (2026).

Zillow's contention that Plaintiffs are improperly conflating separate market metrics is unpersuasive. (*See* Reply at 7 ("Allegations relating to a different market are not sufficient to show monopoly power in real estate search.").) Plaintiffs' direct evidence that Zillow extracts supra-competitive 35% to 40% referral commission splits—compared to a 25% market average—is directly tied to Zillow's search dominance. (*Id.* ¶ 32.) Zillow could not command these inflated rates if it did not hold monopoly power over the upstream search portal that generates the leads. This premium constitutes direct evidence of monopoly leverage. *CoStar Group*, 150 F.4th at 1069.

Zillow argues that its acquisition of search competitors fails to demonstrate actionable entry barriers. (*See* Reply at 7.) The court disagrees. Plaintiffs explicitly allege that Zillow's 61% audience share generates powerful, self-reinforcing network effects. (ACAC ¶ 25.) Because homebuyers overwhelmingly default to Zillow's platform, Plaintiffs plausibly allege that independent agents have no choice but to participate in Zillow's referral ecosystem to access clients. (*Id.* ¶ 95.) As recognized in

*Epic Games*, these self-reinforcing digital loops create significant structural entry barriers by insulating a dominant platform from standard market friction and preventing smaller competitors from scaling. *See* 67 F.4th at 975. Because Plaintiffs have adequately alleged monopoly power within Zillow's interconnected platform market, these factual allegations easily clear the threshold of a Rule 12(b)(6) motion. Accordingly, the court denies Zillow's motion to dismiss on this basis.

**F. Plaintiffs Plausibly Allege State Law Antitrust Claims.**

Based on the alleged tying of real estate referrals to FUB and the forced steering to ZHL detailed above, the Plaintiffs assert statutory violations under the WCPA and the MATA. (ACAC ¶¶ 118-126, 149-153.) Relying on this alleged cross-market leverage, Plaintiffs contend that Zillow has engaged in an unreasonable restraint of trade by using its market power to foreclose competition in CRM and home lending markets. (*Id.* ¶¶ 122, 151.) Plaintiffs allege this systematic course of conduct possesses a sufficient nexus to the public interest under state antitrust laws because it is a generalized policy that threatens to inflate consumer costs and diminish qualitative choice for homebuyers. (*Id.* ¶¶ 123, 152.) Consequently, Plaintiffs allege they have suffered antitrust injury in the form of lost consumer referrals, decreased transaction volume, and supra-competitive overcharges for essential marketplace inputs. (*Id.*)

Zillow also moves to dismiss Plaintiffs' state law antitrust claims under the WCPA and the MATA, arguing that these claims are entirely derivative of the federal claims and therefore fail for the same reasons as the federal claims. (MTD at 16-17.) Courts in both jurisdictions routinely look to federal jurisprudence when evaluating these state-level

statutory frameworks. *See Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 705-06 (9th Cir. 2001) (observing that Washington courts construe the WCPA in harmony with federal decisions interpreting parallel federal antitrust statutes); *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 279 n.2 (4th Cir. 2012) (noting that claims brought under the MATA are generally coextensive with and resolved alongside underlying Sherman Act claims); *see also* Md. Code Ann., Com. Law § 11-202(a)(2) (statutorily directing courts to follow federal judicial guidance when interpreting the state's antitrust acts). Because this court has already concluded that Plaintiffs have plausibly stated a claim under Section 2 of the Sherman Act, (*see supra* Sections III. C, D, and E), Defendants' derivative argument for the dismissal of the state law claims lacks merit. Accordingly, Defendants' motion to dismiss the WCPA and MATA claims on this basis is denied.

**G. Plaintiffs Plausibly State a Washington Consumer Protection Act Claim.**

Plaintiffs also bring claims under the WCPA, alleging that Zillow leverages its market dominance to orchestrate an unfair and deceptive scheme by systematically conditioning access to consumer referrals on multi-layered platform mandates. (ACAC ¶¶ 127-139.) Specifically, Plaintiffs allege that Zillow failed to disclose that participation in its referral programs would require agents to purchase FUB and steer clients to ZHL. (*Id.* ¶ 130.) Plaintiffs contend that this conduct constitutes an unfair method of competition because it requires real estate professionals to compromise their statutory duties as real estate professionals, breach client confidentiality, and risk violating the anti-kickback provisions of the RESPA. (*Id.* ¶¶ 131-34.) Zillow allegedly enforced

these mandates through explicit threats and retaliatory reductions in referral quality or quantity. (*Id.* ¶ 136.) Finally, Plaintiffs allege that this generalized course of conduct carries a broad public interest impact by degrading consumer choice and causing agents severe injury to business and property, including lost business opportunities and termination from critical platforms. (*Id.* ¶ 135, 137.)

To state a claim under the WCPA, a plaintiff must allege: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to business or property; and (5) causation. *See Panag v. Farmers Ins. Co. of Washington*, 204 P.3d 885, 889 (Wash. 2009). An antitrust violation under the Sherman Act functions as an unfair trade practice under the WCPA. *See PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178-82 (W.D. Wash. 2021). For practices unregulated by statute, a plaintiff satisfies the unfairness element by showing the conduct violates the public interest. *Greenberg v. Amazon.com, Inc.*, 553 P.3d 626, 640-41 (Wash. 2024). While Washington law does not eliminate the requirement to plead unfairness, it explicitly confirms that private plaintiffs do not need to satisfy rigid federal consumer injury tests to demonstrate public interest violations. *See id.*

Zillow moves to dismiss the WCPA claim, arguing that Plaintiffs have failed to plead an unfair practice, that the deceptive omission claims fail Federal Rule of Civil Procedure 9(b)'s heightened pleading standard, and that the RESPA safe harbor bars any derivative liability. (MTD at 17-20; Reply at 9-10.) The court disagrees for the reasons set forth below.

Zillow's argument that its targets are merely non-binding metrics is unpersuasive. This court has already sustained Plaintiffs' federal antitrust claims for platform tying, vertical steering, and monopolization. (*See supra* Sections III.C, D, and E.) Because these platform dynamics plausibly disrupt the marketplace, they serve as sufficient grounds to establish an unfair trade practice. *PBTM LLC*, 511 F. Supp. 3d at 1178-82. Furthermore, the complaint satisfies the independent public interest unfairness test under *Greenberg*. 553 P.3d at 640-41. Zillow's contention that it is not "unfair" to expect agents to hit target metrics ignores the direct business harms detailed in the complaint. (*See* Reply at 9 (so arguing).) Plaintiffs explicitly allege they suffered lost business, reduced lead pipelines, and terminated participation in the Preferred program as direct retaliation for refusing to meet ZHL targets. (ACAC ¶¶ 135-36; *see also* Resp. at 18 (citing the ACAC and summarizing the alleged injuries).) These operational penalties constitute a direct injury to business or property that agents could not reasonably avoid while participating in the ecosystem. (ACAC ¶ 136.) Zillow's platform policies thus fall squarely within the WCPA's protective scope. Accordingly, the court concludes that Plaintiffs have adequately alleged an unfair act and a resulting business injury under the WCPA.

**H. Plaintiffs Plausibly State an Oregon Unfair Trade Practices Act Claim.**

Plaintiffs also bring claims under the UTPA, alleging that Zillow engaged in actionable misconduct within its Flex and Preferred Agent programs. (ACAC ¶¶ 163-68.) Specifically, Plaintiffs assert that Zillow violated the UTPA by: (1) conditioning the provision of consumer referrals on an agent's commitment to aid

Zillow in securing future mortgage loans; (2) making material misrepresentations and omissions regarding the characteristics and quality of its referral pipeline; and (3) operating a predatory referral-fee framework that violates the anti-kickback provisions of the RESPA. (*Id.*) Underpinning these claims are detailed allegations that Zillow explicitly failed to disclose to real estate professionals that access to its referral network was strictly contingent upon steering clients to ZHL, satisfying ZHL pre-approval quotas, and purchasing the FUB CRM system. (*Id.* ¶ 166.)

Zillow moves to dismiss the UTPA claim, arguing it is time-barred under the one-year limitations period, fails to plead an enumerated unlawful practice, and lacks a causal injury. (*See* MTD at 21-22; Reply at 9-10.) To state a private claim under the UTPA, a plaintiff must allege: (1) an unlawful trade practice enumerated in the statute; (2) an ascertainable loss of money or property; and (3) causation. *See Bohr v. Tillamook Cnty. Creamery Ass'n*, 567 P.3d 413, 421 (Or. 2025) (citation omitted).

1. Statute of Limitations and the Discovery Rule

An UTPA plaintiff must commence the action within one year after the discovery of the unlawful method, act, or practice. *See* Or. Rev. Stat. § 646.638(6). The limitations period begins when a plaintiff discovers facts creating a substantial possibility that each element of a claim exists. *See Kaseberg v. Davis Wright Tremaine, LLP*, 265 P.3d 777, 782 (Or. 2011). Because an antitrust or unfair trade claim requires an actual loss to be legally complete, the statute of limitations presents a factual question for the jury. Dismissal at the pleading stage is improper unless the face of the complaint shows that

the plaintiff discovered a complete injury outside the one-year window. *See id.*; *Bodin v. B. & L. Furniture Co.*, 601 P.2d 848, 850 (Or. 1979).

Zillow's reliance on *Morris* is misplaced. (*See* Reply at 10 (citing *Morris v. Dental Care Today, P.C.*, 473 P.3d 1137, 1139 (Or. Ct. App. 2020)). In *Morris*, a consumer discovered that her dentures were defective immediately upon receipt, meaning all elements of the fraud claim accrued on day one. 473 P.3d at 1139. By contrast, the present case involves a complex digital platform ecosystem. (*See generally* Compl.)

Plaintiff Alvarez's initial awareness of baseline platform adjustments or general pressure in 2024 may not have immediately resulted in an actionable loss. (*See* ACAC ¶¶ 70, 76.) The ACAC alleges that the true impact of Zillow's automated metrics and quotas culminated in December 2025. (*Id.* ¶¶ 74, 79.) At that point, she exited her brokerage in response to the accumulated pressure, directly causing her real estate pipeline to collapse. (*Id.* ¶ 79.) Because Plaintiffs suffered no financial injury and held no accrued claim until Zillow constructively expelled them from the platform, the complaint does not establish untimely discovery as a matter of law. Tracing the exact moment a reasonable person should have understood the full scope of the platform's restrictions is a fact issue reserved for trial. *See Kaseberg*, 265 P.3d at 782. Accordingly, the court determines that Plaintiff Alvarez's UTPA claim is not time-barred at the pleading stage.

2. <u>Substantive Unfair Practices, Rule 9(b), and Causation</u>

Subsection (1)(o) of the UTPA prohibits conditioning "other value" on a future event after a transaction. Paid referral loops function as a transaction under the UTPA.

*See Bohr*, 567 P.3d at 416 (concluding that paid routing networks satisfy the commercial transaction requirement of the UTPA). For fraudulent omissions, a plaintiff satisfies the pleading standard by showing they interacted with the products under a reasonable expectation that material operational rules would not be deceptively concealed. *See id.*; *Short v. Hyundai Motor Co.*, 444 F. Supp. 3d 1267, 1280 (W.D. Wash. 2020). An ascertainable loss includes out-of-pocket costs and lost business pipeline resulting from forced platform exit. *See Bohr*, 567 P.3d at 418.

Zillow's technical statutory arguments are unpersuasive. First, Zillow argues that its referral leads represent value inherent to the original purchase, rather than a future contingency under subsection (1)(o). (*See* Reply at 11.) This argument ignores the rolling nature of the platform. Plaintiff Alvarez paid for baseline referral access, but Zillow subsequently conditioned the *future quantity and quality* of those leads on hitting ZHL steering quotas. (ACAC ¶¶ 49, 52.) This structure fits the definition of a contingent value.

Second, Zillow cites *Martell v. General Motors LLC*, 492 F. Supp. 3d 1131 (D. Or. 2020) to argue Plaintiff Alvarez failed to plead reliance on an omission. (*See* Reply at 11.) This defense fails under the relaxed pleading standard for fraudulent omission cases. *See Short*, 444 F. Supp. 3d at 1279. The ACAC outlines that Alvarez actively maintained her commercial relationship with Zillow based on the reasonable expectation that access would not be retroactively conditioned on mandatory software purchases and hidden mortgage steering requirements. (ACAC ¶ 130.) As ruled under the WCPA

analysis, the RESPA safe harbor is inapplicable because the challenge targets unfair trade practices, not standard commission splits.

Finally, Zillow's argument that Plaintiff Alvarez caused her own injury by changing brokerages is incorrect. (MTD at 22.) According to Plaintiffs, Zillow explicitly threatened to terminate agents or cut off their lead allocations if they failed to meet targets. (ACAC ¶¶ 48, 71.) Plaintiffs further allege that leaving the brokerage was the only path to avoid the financial penalties of Zillow's automated quotas. (*Id.* ¶¶ 71-75, 79.) This forced transition functions as a constructive discharge from the platform ecosystem, directly causing Plaintiff Alvarez out-of-pocket costs and disrupted pipelines. (*Id.* ¶ 79.) Under *Bohr*, these detailed financial injuries satisfy the ascertainable loss rule. 567 P.3d at 418. Plaintiffs have plausibly stated all elements of a UTPA claim, and the court denies Zillow's motion to dismiss this count.

**I. Plaintiffs Plausibly State an Unjust Enrichment Claim.**

Plaintiffs bring parallel claims for unjust enrichment under the laws of Washington, Maryland, and Oregon, alleging that Zillow deliberately engineered its marketplace and lending programs to extract millions of dollars in ill-gotten revenue through its coercive steering framework and the abuse of its monopoly power. (ACAC ¶¶ 140-48 (Washington), 154-62 (Maryland), 169-77 (Oregon).) Specifically, Plaintiffs assert that Zillow knowingly accepted and appreciated monetary benefits conferred by class members in two forms: (1) revenues derived from conditioning valuable real estate referrals on steering clients to ZHL, and (2) supra-competitive referral fees and rates extracted from Preferred Agents. (*Id.* ¶¶ 142-43, 156-57, 171-72.) Plaintiffs contend that

allowing Zillow to retain these economic benefits would be inequitable and unjust. (*Id.*) Asserting that they lack an adequate remedy at law to fully divest Zillow of its unlawful profits, Plaintiffs seek recovery of the amounts realized at their expense or, alternatively, seeking non-restitution disgorgement and the imposition of a constructive trust over Zillow's ill-gotten gains. (*Id.* ¶¶ 148, 162, 177.)

An unjust enrichment claim requires a plaintiff to show that they conferred a benefit upon the defendant, and that the defendant's retention of that benefit without payment is inequitable. *See Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008) (Washington); *Winters v. Cnty. of Clatsop*, 150 P.3d 1104, 1106 (Or. 2007) (Oregon); *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007) (Maryland). Under Washington, Oregon, and Maryland law, the existence of a valid express contract governing the same subject matter precludes recovery under a quasi-contractual theory of unjust enrichment. *Taie v. Ten Bridges LLC,* 568 F. Supp. 3d 1126, 1133 (W.D. Wash. 2021) (citing *Young*, 191 P.3d at 1262) (Washington); *Gillett v. Tucker*, 507 P.3d 323, 331 (Or. 2022) (Oregon); *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 607 (Md. 2000) (Maryland). An unjust enrichment claim survives dismissal, however, if a defendant deploys coercive, mid-stream changes that fall completely outside the original contemplation of the parties or transfer significant, uncompensated financial burdens onto the plaintiffs. *Young*, 191 P.3d at 1262-63 (Washington); *Kizer Excavating Co. v. Stout Bldg. Contractors, LLC*, 525 P.3d 883, 887, *opinion adhered to as modified on reconsideration*, 529 P.3d 1024 (Or. App. 2023) (Oregon); *Janusz v. Gilliam*, 947 A.2d 560, 567 (Md. App. 2008) (Maryland).

In its motion, Zillow asserts that Plaintiffs' unjust enrichment claims fail as a matter of law because: (1) the parties are bound by valid, express contracts covering the terms of their participation in the Preferred Agent program; (2) Plaintiffs fail to allege they conferred a cognizable benefit upon Zillow; and (3) Plaintiffs fail to allege any inequitable circumstances surrounding the retention of any such benefit. (MTD at 23-24.) Furthermore, Zillow contends that to the extent Plaintiffs allege conduct falling outside the terms of the express agreements, they are raising a new theory of liability in an opposition brief, which is procedurally impermissible. (Reply at 12 (citing *Grae-El v. City of Seattle*, No. C21-1678JLR, 2022 WL 721489, at *5 (W.D. Wash. Mar. 10, 2022) for the proposition that a court may not consider entirely new factual allegations raised for the first time in an opposition brief).)

The court finds Zillow's arguments unpersuasive. Zillow contends that, because the ACAC fails to explicitly allege that the contract excluded language allowing Zillow to set or adjust performance metrics, Plaintiffs are procedurally barred from introducing new theories claiming so in their briefing. (Reply at 12.) The court, however, finds that this defense mischaracterizes the pleadings. The ACAC does not merely challenge standard, routine adjustments to performance metrics; rather, the complaint sets forth a fundamental, structural transformation of the agreement between the parties. (*See* ACAC ¶¶ 43, 61, 70.) Plaintiffs explicitly alleged in the ACAC that they joined the Preferred network under a baseline agreement to pay commission splits for client leads. (*Id.* ¶¶ 29-30.) They further alleged that Zillow subsequently exploited this access by

requiring them to pay $500 per month for FUB software and satisfy coercive ZHL mortgage pre-approval quotas. (*Id.* ¶¶ 46, 61, 75.)

These sudden, multi-industry mandates are not simple "metric adjustments" covered by a standard referral contract. They represent significant, extra-contractual additions that fall completely outside the original bargain. Because these facts are anchored directly in the text of the complaint, the holding of *Grae-El* does not apply. WL 721489, at *5. Because the baseline agreements did not contemplate these coercive software and steering additions, the contract bar does not apply as a matter of law, and the Plaintiffs may plead unjust enrichment in the alternative.

Second, the court finds that Plaintiffs sufficiently allege that they conferred a cognizable benefit upon Zillow as required under Washington and Maryland state law. (MTD at 23.) In so holding, the court rejects Zillow's contention that assets—such as mandatory software subscription revenues and mortgage referrals—fall completely outside the scope of actionable benefits. (*See* MTD at 23 (asserting that because some Plaintiffs refused to steer clients to ZHL or purchase FUB, that they have failed to allege that they conferred a benefit upon Zillow).)

Under the governing state frameworks, the definition of a cognizable benefit is broad, encompassing any economic enrichment, monetary gain, or commercial advantage conferred upon a defendant. *See Young*, 191 P.3d at 1262 (Washington) (defining a benefit as any form of enrichment, including services or property values); *Bohr*, 567 P.3d at 418; *Hill*, 936 A.2d at 351 (Maryland) (noting that a benefit can be any advantage that has value). While these precedents do not explicitly name modern digital assets, their

underlying principles apply with equal force to cash premiums, forced software subscription revenues, and mortgage referrals, all of which represent tangible commercial values acquired by Zillow. Furthermore, when an antitrust defendant deploys restrictive rules to collect inflated fees or compel commercial concessions, such conduct can constitute an unfair business practice rooted in anticompetitive effects. *See Epic Games,* 67 F.4th at 1001-02 (holding that restrictive platform rules can create an unlawful commercial advantage by stifling choice and inflating costs). Accordingly, the ACAC satisfies the pleading requirements for both the conferral of a benefit and circumstances making its retention unjust.

Finally, Zillow argues that its distribution of client leads creates a complete, equitable exchange of value that precludes an unjust enrichment claim. (Reply at 12.) The court again disagrees. While Zillow once provided an independent lead-generation service, the ACAC plausibly alleges that Zillow subsequently leveraged its network to extract extra-contractual advantages falling outside the original agreement. (*See* ACAC ¶¶ 29-30, 46, 61, 75.) According to Plaintiffs, Zillow compelled agents to buy and use FUB, directly generating subscription revenue for Zillow—while charging referral commission splits of 35% to 40% that allegedly exceed standard market baselines. (*Id.* ¶¶ 4, 32, 46, 57.) Plaintiffs further allege that by forcing agents into the FUB ecosystem, Zillow extracted valuable, proprietary consumer interaction data, which it used to benefit its own mortgage lending pipeline and enforce its platform quotas. (*Id.* ¶¶ 39, 77-78.) These financial splits and data assets constitute distinct, quantifiable commercial benefits. *See Young*, 191 P.3d at 1262. Because Plaintiffs have sufficiently alleged that the retention of these

uncompensated, extra-contractual advantages is inequitable, Zillow's exchange-of-value defense fails at this stage.

According to Plaintiffs, Zillow did not acquire these commission splits and software data captures through fair competition on the merits; it extracted them through illegal tying and vertical steering schemes. Under modern antitrust jurisprudence, retaining benefits extracted through anticompetitive coercion is inherently inequitable. *See Epic Games*, 67 F.4th at 1001. Because this court has already sustained Plaintiffs' underlying federal and state antitrust claims (*see supra* Sections III.C through I), Zillow's retention of these benefits is inherently inequitable. *See Larisa's*, 362 Or. at 127. Plaintiffs have plausibly stated all elements of their unjust enrichment claims, and the court denies Zillow's motion to dismiss Counts VI, VIII, and X.

## IV. CONCLUSION

For the foregoing reasons, the court DENIES the motion to dismiss (Dkt. # 30).

Dated this 28th day of September, 2026.

JAMES L. ROBART
United States District Judge